2011 UT App 262

**STATE of Utah, Plaintiff and Appellee,**

v.

**Billy J. MARKS, Defendant and Appellant.**

No. 20090199–CA.

Court of Appeals of Utah.

Aug. 11, 2011.

Lori J. Seppi and Denise M. Porter, Salt Lake City, for Appellant.

Mark L. Shurtleff and Christine F. Soltis, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ROTH.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Billy J. Marks appeals from his conviction of one count of sodomy upon a child, a first degree felony, see Utah Code Ann. § 76-5-403.1 (1999). Marks argues that the trial court erred by refusing to permit him to question the complainant (Grandson) about previous sexual behavior and by denying Marks's motion to dismiss for insufficiency of the evidence. We affirm.

## BACKGROUND

¶ 2 Grandson's maternal grandmother (Grandmother) was married to Marks at the time Grandson was born. When Grandson was two months old, he had a seizure and was diagnosed with meningitis encephalitis. Grandson's illness left him "mentally challenged." Although Grandson was in tenth grade at the time of trial, he attended only special education classes and functioned at approximately the level of a third- or fourth-grade student. Because Grandson's mother was unable to care for him, Grandmother and Marks became his guardians. Grandmother and Marks divorced in 2001, but Grandson continued to visit Marks on a regular basis, and the two maintained a "very strong" relationship.

¶ 3 In July or August 2006, Grandson disclosed to Grandmother, and later to his uncle (Uncle), that Marks had orally sodomized him the previous summer. Grandmother contacted the police and Grandson was interviewed at the Children's Justice Center (CJC). The CJC videotaped the interview of Grandson describing the incident. Based on Grandson's allegations, Marks was charged with one count of sodomy upon a child.

¶ 4 At the preliminary hearing, Grandmother revealed that sometime in the fall of 2005, she discovered Grandson with his seven-year-old sister (Sister), "touching [Sister's] breasts[ ] and . . . getting on top of her like they were having sex." Both children were in their underwear at the time. When Grandmother questioned him about the incident, Grandson told her that he "didn't understand what [he] was doing." Grandson was twelve or thirteen at the time of this incident. Then, sometime in the first three months of 2006, Grandmother found Grandson with a picture "of women . . . [e]ngaged in sexual activity." Grandmother asked Marks to speak with Grandson about it and Marks told her that he had done so. In approximately July of that same year, "it happened again," and "[Grandson] knew he was in trouble" when Grandmother again caught him with a picture of naked women.[1]

---

1. It is unclear from the record whether this was the same picture Grandmother had discovered Grandson with on the previous occasion.

In response to Grandmother's questions, Grandson indicated that the picture "was an old one that he had printed up at [Marks's house]." Grandmother then spoke with Grandson about "accessing the . . . porno at [Marks's house]," and Grandson explained that "it just pops up on my screen." According to Grandmother, Grandson disclosed that Marks had sexually abused him about two weeks later.[2] Grandson had just returned from a visit with Marks, and he "seemed kind of strange, just very quiet, withdrawn." When Grandmother asked if something was wrong, Grandson first said "no," and then blurted out, "Grandpa sucked my dick." Upon further questioning, Grandson told Grandmother that the incident had occurred the previous summer, but he was afraid to tell her about it because Marks had threatened him.

¶ 5 Grandson also testified at the preliminary hearing; he was fourteen years old at the time. Grandson's best recollection was that he was thirteen years old when Marks sexually assaulted him. He remembered that it was summertime because it was hot, people had their pools out, and he was not in school. He also believed that it happened in the summer of 2005, when he had just finished the seventh grade. Grandson testified that he first reported the incident to Grandmother around his birthday in March of the following year because he saw a television show about child abuse. Grandson claimed that prior to watching the show, he did not "know what happened, what [his] Grandpa did to [him]." Grandson thought Marks was "just showing [him] what sex was." After he saw the television show, Grandson understood that what Marks had done to him was "a bad thing, so [he] told [his] Grandmother." Although Grandson told Grandmother about the abuse after the incident with Sister and after the two times he was caught with the pornographic picture, Grandson testified on

cross-examination during the preliminary hearing that prior to seeing the television show he did not know what sex was, had no understanding of sexuality at all, and had never read anything about sexuality. In response to defense counsel's further questions, Grandson indicated that he had not "done anything sexually inappropriate with anybody" other than Marks; had "never seen anything on the internet that involved sex" before watching the television show; and had "never seen any pornographic images," which Grandson understood meant pictures of naked women in sexual positions.

¶ 6 Before trial, Marks filed a motion pursuant to rule 412 of the Utah Rules of Evidence to admit the evidence related to Grandson's possession of pornography and the incident with Sister for the purpose of demonstrating that Grandson had the sexual knowledge and the motive to fabricate an allegation of abuse against Marks.[3] The defense also claimed that the evidence was admissible for impeachment purposes because Grandson had untruthfully denied looking at internet pornography and touching anyone inappropriately.

¶ 7 At the rule 412 hearing, defense counsel argued that when he tried to explore Grandson's sexual knowledge at the preliminary hearing, Grandson did not tell the truth. Thus, the defense argued that like a prior false allegation of rape, the evidence should be admitted to prove Grandson's lack of credibility. Because Grandson was the only witness to the alleged abuse and there was no corroborating physical evidence, the defense claimed the opportunity to cross-examine him about his prior untruthfulness was critical. In addition, the defense alleged that although Grandson was not a child of tender years, due to his mental disability the jury would draw the inference that Grandson would not have the sexual knowledge to de-

---

**2.** At trial, however, Grandmother testified that she spoke with Grandson about being caught with the pornographic picture for the second time "just before he made this disclosure" about Marks.

**3.** Although Marks properly filed his motion under seal, *see* Utah R. Evid. 412(c)(2) ("The motion, related papers, and the record of the hear-

ing must be sealed and remain under seal unless the court orders otherwise."), a duplicate copy of the motion, the State's response, and the trial court's ruling were inadvertently placed in the pleadings file without being sealed. We grant the State's motion to seal these documents, the transcripts of the rule 412 and preliminary hearings, and the parties' briefs filed with this court.

scribe the allegations against Marks but for the fact that the abuse really took place. Consequently, the defense claimed that the evidence should be admitted to rebut the inference that "mentally disabled children, and even adults, are naive when it comes to sexual matters." In response to questions from the trial court, defense counsel confirmed that he intended to offer expert testimony "that mentally handicapped people . . . wouldn't necessarily be naive" but argued that Marks was still entitled to present evidence that Grandson specifically was not uninformed about sexual matters. In response, the State argued that the evidence should be excluded under rule 412 because it did not involve sex acts similar to those Grandson alleged occurred with Marks and therefore could not explain his ability to fabricate those allegations. The defense argued on rebuttal that the fact that Grandson had the picture printed from the internet showed that he had access to internet pornography generally, not just to that picture.

¶ 8 The trial court denied the motion, concluding that Grandson's possession of pornography and the incident with Sister were "not probative of [Grandson]'s knowledge with respect to the act in this case, fellatio between two males"; that the details of why Grandson was in trouble did not explain why he would falsely accuse Marks; and that the defense could "adequately explore [Grandson's] truthfulness and propensity for lying versus telling the truth by questioning [Grandmother] without addressing [Grandson's] sexual incidents" and by "attack[ing] inconsistencies in [Grandson's] story, the timing of the allegations, and the adequacy of the detective's investigation." Therefore, the trial court concluded that exclusion of the evidence did not violate Marks's Sixth Amendment right to confront his accuser and should be excluded under rule 412. In addition, the trial court determined that the evidence was inadmissible under rule 403 of the Utah Rules of Evidence because its probative value was outweighed by the danger of unfair prejudice.

¶ 9 Marks was tried before a jury for three days in November 2008. Grandson's trial testimony regarding when and how the abuse occurred was inconsistent in a number of respects with his previous testimony during the CJC interview, as well as his testimony at the preliminary hearing. For example, at trial, Grandson stated that on the morning of the abuse, he exited the shower and Marks, who was still "in bed under his covers," told Grandson to come into the room. However, at the CJC interview, Grandson testified, "I got out of the shower and I saw him naked," and at the preliminary hearing, Grandson said that he saw Marks naked under the covers. Grandson's trial testimony regarding what happened during the abuse was also different from his earlier statements. At trial, Grandson testified that when Marks ordered Grandson to get into bed with him, Marks was masturbating and became erect. Yet, at the CJC interview, Grandson stated that Marks could not achieve an erection. And at the preliminary hearing, Grandson did not indicate that Marks was masturbating and stated that Marks did not become erect. Further, Grandson testified for the first time at trial that during the abuse Grandson became erect and ejaculated "goo stuff." At the CJC interview, however, Grandson said that nothing happened to his body after Marks performed fellatio on him, and at the preliminary hearing, Grandson testified that he became erect during the abuse but he was not sure why Marks stopped. Finally, the evidence at trial concerning Grandson's age at the time of the abuse and when and to whom he reported it was confusing. At trial, defense counsel cross-examined Grandson regarding the discrepancies among his three statements about the abuse and about his age when it occurred.

¶ 10 Marks did not testify at trial. Instead, the defense relied on cross-examination of Grandson and argued that the significant differences among his versions of the abuse created a reasonable doubt that the abuse occurred. In addition, after the State rested, the defense moved for dismissal of the charges, arguing that the inconsistencies in Grandson's testimony made it insufficient, standing alone, to support a guilty verdict beyond a reasonable doubt. Marks also claimed that dismissal was appropriate because the State had failed to prove that

Grandson was under fourteen years of age at the time of the abuse. The trial court denied the motion, and the jury found Marks guilty. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

██ ¶ 11 First, Marks argues that the trial court violated his Sixth Amendment right to confrontation, *see* U.S. Const. amend. VI,[4] by excluding evidence of Grandson's sexual behavior under rule 412 of the Utah Rules of Evidence. "When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion." *State v. Chavez*, 2002 UT App 9, ¶ 17, 41 P.3d 1137; *see also State v. Clark*, 2009 UT App 252, ¶ 10, 219 P.3d 631, *cert. denied*, 225 P.3d 880 (Utah 2010); *State v. Quinonez–Gaiton*, 2002 UT App 273, ¶ 10, 54 P.3d 139. If that review convinces us that an error has occurred, we must then determine "whether, assuming that the damaging potential of the cross-examination [had been] fully realized," we are convinced "that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

██ ¶ 12 Second, Marks argues that the trial court erred in denying his motion to dismiss because the State's evidence was insufficient to support a guilty verdict. A trial court's ruling on a motion to dismiss is a question of law, which we review for correctness. *See State v. Hamilton*, 2003 UT 22, ¶ 17, 70 P.3d 111. However, we will reverse only if "the evidence [presented] is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288 (internal quotation marks omitted).

## ANALYSIS

### I. Marks's Confrontation Clause Claims

██ ¶ 13 Marks first argues that the trial court violated his right to confrontation by prohibiting him from questioning Grandson about the incident with Sister and about Grandson's possession of pornography based on rule 412 of the Utah Rules of Evidence.[5] "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or . . . [the] Confrontation [C]lause[ ] of the Sixth Amendment,[6] the [United States] Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). A complete defense includes "the right to conduct reasonable cross-examination." *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam); *see also Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. 1431 (noting that the main purpose of the Confrontation Clause is to provide a criminal defendant

---

**4.** "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (citing *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)); *see also* U.S. Const. amends. VI, XIV; Utah Const. art. I, § 12 (guaranteeing a criminal defendant the right "to be confronted by the witnesses against him"). Marks has not argued that the state constitution provides greater protection than the federal constitution.

**5.** Rule 412 provides in relevant part,
 (a) *Evidence generally inadmissible.* The following evidence is not admissible in any criminal proceeding involving alleged sexual misconduct except as provided in paragraphs (b) and (c):

 (a)(1) evidence offered to prove that any alleged victim engaged in other sexual behavior;
 . . . .
 (b) *Exceptions.* The following evidence is admissible, if otherwise admissible under these rules:
 . . . .
 (b)(3) evidence the exclusion of which would violate the constitutional rights of the defendant.
 Utah R. Evid. 412.

**6.** The Sixth Amendment to the United States Constitution states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI.

with the opportunity to cross-examine his accusers). Indeed, cross-examination has been described as the " 'greatest legal engine ever invented for the discovery of truth.' " *State v. Vargas*, 2001 UT 5, ¶ 28 n. 7, 20 P.3d 271 (quoting *California v. Green*, 399 U.S. 149, 158–59, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

■ ¶ 14 Nevertheless, a defendant's Sixth Amendment right to confront his accuser "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Michigan v. Lucas*, 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (internal quotation marks omitted); *see also State v. Tarrats*, 2005 UT 50, ¶ 36, 122 P.3d 581 ("[T]he defendant's right to confront witnesses is not absolute."). Thus, "trial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Lucas*, 500 U.S. at 149, 111 S.Ct. 1743; *accord Tarrats*, 2005 UT 50, ¶ 36, 122 P.3d 581; *Chavez*, 2002 UT App 9, ¶ 19, 41 P.3d 1137. Those limitations on a defendant's right to confront witnesses and to offer evidence in support of his defense, however, " 'may not be arbitrary or disproportionate to the purposes they are designed to serve.' " *Lucas*, 500 U.S. at 151, 111 S.Ct. 1743 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)); *accord Tarrats*, 2005 UT 50, ¶ 36, 122 P.3d 581.

■ ¶ 15 Rule 412 of the Utah Rules of Evidence is one instance where the Utah courts have recognized that the defendant's right to present relevant testimony may be limited to accommodate the legitimate interests of the alleged victim of sexual abuse.[7]

*See Tarrats*, 2005 UT 50, ¶ 37, 122 P.3d 581; *see also Quinonez–Gaiton*, 2002 UT App 273, ¶ 14, 54 P.3d 139. Generally, rule 412 "serves to bar all evidence of the alleged victim's other sexual behavior." *Clark*, 2009 UT App 252, ¶ 14, 219 P.3d 631. The rule's bar on the admission of evidence concerning the accuser's sexual activity is a recognition by the Utah courts that in most instances, an alleged victim's prior sexual conduct is simply not relevant to the issue of whether a rape or sexual assault has occurred. *See Tarrats*, 2005 UT 50, ¶ 21, 122 P.3d 581. Furthermore, "[e]ven where such evidence bears some marginal relevance, it has an unusual propensity to unfairly prejudice, inflame, or mislead the jury and is likely to distort the jury's deliberative process … and should therefore be excluded." *Id.* (citation and internal quotation marks omitted). However, rule 412 is subject to several express exceptions, *see* Utah R. Evid. 412(b), including where "the exclusion of [otherwise admissible evidence] would violate the constitutional rights of the defendant." *Id.* R. 412(b)(3).[8]

¶ 16 Marks contends that his constitutional rights were violated because he was prohibited from introducing evidence of the incident with Sister and of Grandson's possession of pornography. To prevail on an argument based on rule 412's constitutional exception, Marks must establish that the evidence was "otherwise admissible under [the rules of evidence]," *see* Utah R. Evid. 412(b), and that its exclusion would violate his constitutional rights, *see id.* R. 412(b)(3); *see also State v. Clark*, 2009 UT App 252, ¶ 16, 219 P.3d 631 ("A Sixth Amendment violation occurs when a defendant is 'prohibited from engaging in *otherwise appropriate* cross-examination.' " (emphasis added) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89

---

7. Utah's rule 412 is patterned after rule 412 of the Federal Rules of Evidence, with the exception that Utah's rule 412 applies only in criminal cases. *See* Utah R. Evid. 412 advisory comm. notes.

8. Rule 412 also permits the admission of evidence concerning the accuser's prior sexual history where it is offered to prove that someone other than the defendant was the source of physi-

cal evidence, or to establish sexual contact between the defendant and the accuser where consent is at issue or the evidence is offered by the prosecution. *See* Utah R. Evid. 412(b)(1)-(2). However, because consent is never an issue in the prosecution of charges of child sexual assault and there was no physical evidence corroborating Grandson's allegations, these exceptions have no relevance here.

L.Ed.2d 674 (1986)), *cert. denied,* 225 P.3d 880 (Utah 2010)).

¶17 For example, Marks had the right to engage in "cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which [it] . . . could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431 (omission in original) (internal quotation marks omitted). But even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Utah R. Evid. 403; *Tarrats,* 2005 UT 50, ¶21, 122 P.3d 581 (noting that even in the rare cases when evidence of the complainant's sexual behavior is relevant it may still be excluded under rule 403); *State v. Boyd,* 2001 UT 30, ¶39, 25 P.3d 985 (holding that although evidence of a rape victim's past sexual conduct fell within an exception to rule 412, it could still be excluded if it did not satisfy the requirements of rule 403). Furthermore, unreliable evidence is not admissible. *See generally* Utah R. Evid. 801–802 (defining hearsay and excluding its admission). *But see id.* R. 803–807 (governing the instances where hearsay is admissible).

¶18 The interplay between rule 412 and the Confrontation Clause puts trial judges in the difficult position of trying to strike the correct balance between two important interests: the accused's right to present a complete defense and the State's interest in protecting the complaining witnesses in sex crime prosecutions from unnecessarily intrusive invasions into private sexual matters. There is a strong public interest in identifying, prosecuting, and removing from society persons who sexually abuse others. *See State v. Green,* 2004 UT 76, ¶40, 99 P.3d 820 (noting the State's interest in protecting vulnerable individuals from exploitation, including sexual assault and statutory rape). Indeed, the United States Supreme Court recently quantified the problem, stating,

> Sex offenders are a serious threat in this Nation. In 1995, an estimated 355,000 rapes and sexual assaults occurred nationwide. Between 1980 and 1994, the population of imprisoned sex offenders increased at a faster rate than for any other category of violent crime. As in the present case, the victims of sexual assault are most often juveniles. In 1995, for instance, a majority of reported forcible sexual offenses were committed against persons under 18 years of age. Nearly 4 in 10 imprisoned violent offenders said their victims were 12 or younger.

*McKune v. Lile,* 536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (citations omitted). When the crime is child sexual abuse, the societal interests are elevated by the vulnerability of the victims and the impact of the abuse on their ability to become emotionally healthy adults. *See State v. Bishop,* 717 P.2d 261, 266–67 (Utah 1986) ("Oral sex by or upon a child is likely to have long-term and perhaps lifetime, deleterious effects upon that child. The State has a strong interest in protecting children from sexual abuse and exploitation."). According to our supreme court, "[t]here is no other crime which shocks the conscience of society as does the sexual abuse of a helpless child." *State v. Matsamas,* 808 P.2d 1048, 1055 (Utah 1991). Consequently, the legislature and the courts have adopted laws and rules that encourage the reporting of such crimes, reduce the impact on the child complainants, and harshly punish convicted pedophiles. *See, e.g.,* Utah Code Ann. § 76-5-406.5 (2008) (limiting instances when a defendant who has pleaded guilty to child sexual abuse can be considered for probation); Utah R.Crim. P. 15.5 (governing the use of out-of-court statements of child victims or child witnesses of sexual or physical abuse).

¶19 However, in the zeal to protect children from the horrendous impacts of sexual abuse, we must not lose sight of the fact that to be falsely accused of child sexual abuse would also be devastating. The framers of our Constitution understood the importance of designing a criminal justice system that includes protection of the rights of the defendant. Persons accused of crimes, even despicable crimes, are presumed innocent until they are proven guilty beyond a reasonable doubt. *See State v. Jeffs,* 2010 UT 49, ¶2, 243 P.3d 1250 ("[T]he presumption of innocence guaranteed to all by our Constitution

demands great care from the courts and those who prosecute on behalf of the people."). Criminal defendants are entitled to be represented by counsel, and they have the right to confront the witnesses against them. *See* U.S. Const. amend. VI. These protections also represent important societal interests, including the goal of maintaining a fair and impartial judicial system. *See State v. McClellan*, 2009 UT 50, ¶ 20, 216 P.3d 956 (explaining that "fairness and impartiality in the adjudication process must be diligently maintained in order to ensure public faith in the impartiality and integrity of the justice system" (internal quotation marks omitted)). "[B]ecause of the strong emotions which surround [child sexual abuse] cases[,] . . . we must insure that trial proceedings are fair and that the rights of all concerned are protected." *Matsamas*, 808 P.2d at 1055.

¶ 20 Even before Utah's adoption of rule 412, this tension between the rights of the accused and the interests of the accuser has been a subject of our jurisprudence. *See* Utah R. Evid. 412 advisory comm. notes (noting that Utah had judicially imposed restrictions on the admissibility of evidence of the accuser's sexual conduct or reputation before the adoption of rule 412). Indeed, fourteen years before the adoption of rule 412, the Utah Supreme Court explained in *State v. Johns*, 615 P.2d 1260 (Utah 1980), that evidence of the complainant's general reputation for chastity or prior instances of sexual behavior

> is admissible only when the court finds under the circumstances of the particular case such evidence is relevant to the material factual dispute and its probative value outweighs the inherent danger of unfair prejudice to the [complainant], confusion of issues, unwarranted invasion of the complainant's privacy, consideration of undue delay and time waste and the needless presentation of cumulative evidence.

*Id.* at 1264; *accord State v. Lovato*, 702 P.2d 101, 105 (Utah 1985). The *Johns* court identified four factors that should be considered by the trial court in making the admissibility determination: "(a) relevancy and probative value; (b) prejudicial effect; (c) confusion of the issues and undue consumption of time;

and (d) substantial justice." 615 P.2d at 1263.

¶ 21 In *State v. Moton*, 749 P.2d 639 (Utah 1988), the supreme court applied those factors in the child sexual abuse context, rejecting the defendant's claim that the trial court had improperly restricted his right to cross-examine his ten-year-old accuser. *See id.* at 643–44. Although the trial court allowed the defendant to elicit testimony from the child that she "knew a lot about sex and, in fact, knew all about sexual anatomy and understood the act of fellatio," it sustained the State's objections to questions about the specific instances of the child's prior sexual experience. *See id.* at 641–42. A majority of the supreme court upheld the defendant's conviction, concluding that the introduction of the other evidence of the child's sexual sophistication either rendered the restrictions on cross-examination reasonable, *see id.* at 644, or made any error in limiting cross-examination harmless, *see id.* (Zimmerman, J., concurring).

¶ 22 After the adoption of rule 412, effective July 1, 1994, the Utah Supreme Court continued to view attempts to admit evidence of the complainant's other sexual conduct skeptically in sexual assault prosecutions. Like the United States Supreme Court, our supreme court has approved the exclusion of this type of evidence under the rules of evidence, including rule 412, so long as the resulting "impingements upon a defendant's constitutional rights . . . are not 'arbitrary or disproportionate to the purposes [the rule is] designed to serve.'" *See State v. Tarrats*, 2005 UT 50, ¶ 36, 122 P.3d 581 (quoting *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir.1994)); *see also State v. Martin* (*Martin II*), 2002 UT 34, ¶ 40 n. 5, 44 P.3d 805 (noting that sexual proclivity evidence "becomes admissible if it satisfies the requirements of one of rule 412's specifically enumerated exceptions, the procedural requirements of that rule, and the other strictures of admissibility imposed by the Utah Rules of Evidence generally"). The consideration of whether the exclusion of evidence is disproportionate to rule 412's purpose, thereby violating the defendant's constitutional right to confrontation, involves the bal-

ancing of the interests of the defendant against those of the State under the facts and circumstances of the particular case. *See Michigan v. Lucas*, 500 U.S. 145, 153, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (remanding for consideration of "whether, on the facts of this case, preclusion [of the evidence of the complainant's prior sexual activity] violated [the defendant's] rights under the Sixth Amendment); *see also Barbe v. McBride*, 521 F.3d 443, 449 (4th Cir.2008) ("[U]nder the *Rock–Lucas* Principle, a state court cannot impose a per se rule for disallowing evidence under a rape shield law; rather, it must determine, on a case-by-case basis, whether the exclusionary rule 'is arbitrary or disproportionate to the State's legitimate interests.'" (quoting *Lucas*, 500 U.S. at 151, 111 S.Ct. 1743)).

 ¶ 23 Here, the trial court excluded the evidence under both rule 403 and rule 412. Pursuant to rule 403, evidence of the complainant's sexual activity is inadmissible unless the evidence is "relevant to a material factual dispute and its probative value outweighs the inherent danger of unfair prejudice to the victim, confusion of the issues, unwarranted invasion of the complainant's privacy, considerations of undue delay and time waste and the needless presentation of cumulative evidence." *State v. Boyd*, 2001 UT 30, ¶¶ 39–42, 25 P.3d 985 (internal quotation marks omitted) (holding that evidence of complainant's sexual activity with another man on the night of the alleged rape fell within an exception to rule 412 but was presumed inadmissible and properly excluded under rule 403); *see also* Utah R. Evid. 403. To determine if exclusion of evidence violates the Confrontation Clause, the court must assess both the importance of the evidence to an issue critical to the defense and the extent to which exclusion of the evidence will further the purposes of the rule under which it is excluded. *See Tarrats*, 2005 UT 50, ¶ 37, 122 P.3d 581. Thus, under either rule 403 or rule 412, the relevance of the challenged evidence is an important component of the admissibility analysis. And a determination that the evidence of the complainant's sexual history is of marginal or no probative value will likely result in its exclusion under both rule 403 and rule 412. Therefore, we begin

our analysis by considering the relevance of the evidence of Grandson's possession of pornography and the incident with Sister. We then examine the extent to which its exclusion furthers the purposes of rule 412. Because we determine that the evidence was properly excluded under rule 412, we do not separately address its exclusion under rule 403.

## A. The Relevance of the Excluded Evidence

¶ 24 Marks contends that the evidence is probative of three issues critical to his defense: (1) that Grandson had a motive to fabricate the allegations against Marks, (2) that there is an alternative source for Grandson's sexual knowledge, and (3) that Grandson is not credible. We address each of these issues in turn.

### 1. The Evidence of Grandson's Possession of Pornography Was Not Relevant to Grandson's Motive To Lie.

¶ 25 Marks claims that he was entitled to provide evidence from which the jury could find that Grandson fabricated the allegations to redirect Grandmother's anger over catching Grandson, for the second time, with pornography. According to Marks, the pornography was printed from his computer and, therefore, "Marks's name was already part of the conversation and was ... the likely choice for a quickly-invented allegation of abuse." We are not convinced.

 ¶ 26 First, there is little obvious connection, if any, between the excluded evidence and the theory advanced by the defense. The fact that Grandson was in trouble for possessing a picture of two naked women engaged in sexual activity, even if printed from Marks's computer, does not explain why Grandson would falsely disclose that Marks had orally sodomized him. Nor does this evidence "reveal[an] underlying hostility that would suggest an independent motive to accuse him falsely." *State v. Clark*, 2009 UT App 252, ¶ 19, 219 P.3d 631, *cert. denied*, 225 P.3d 880 (Utah 2010). Grandson and Marks had previously enjoyed a good relationship, and Grandson did not suggest that Marks encouraged him to view

pornography on the internet. Thus, nothing about the details of Grandson's transgression supports the defense theory that Grandson wanted to deflect Grandmother's attention better than can be argued from the simple fact that Grandson was in serious trouble at the time he made his allegations against Marks.

¶ 27 Indeed, the facts of this case are strikingly similar to those considered by this court in *State v. Quinonez–Gaiton*, 2002 UT App 273, 54 P.3d 139. There, the child complainant's stepmother caught him engaged in sexual activity with her son and demanded to know where he had learned such conduct. *See id.* ¶ 2. The child responded by accusing the defendant of sexually abusing him. *See id.* The defendant sought to introduce evidence of this incident to demonstrate that the child may have been motivated to fabricate the accusations against him in order to redirect his stepmother's anger. *See id.* ¶¶ 14, 18. The *Quinonez–Gaiton* court held that exclusion of those details did not violate the defendant's right to confrontation because the trial court permitted the defendant to question the child generally and to establish that he was in trouble with his stepmother at the time of the disclosure. *See id.* ¶¶ 16–18. In so holding, the *Quinonez–Gaiton* court observed,

> It was not necessary to expose the fact that [the child complainant] engaged in a sexual act with his stepbrother to effectively challenge the credibility of the accusations he made against [the defendant]. In fact, revealing that [the child complainant] engaged in a sexual act with his stepbrother sheds little or no light, by itself, on why [the child complainant] would be motivated to accuse [the defendant], of all the people in the world, of sexually abusing him. In contrast, the perceived need to blurt out a name in the hope of terminating parental browbeating sheds such light, wholly aside from exactly what prompted the browbeating.

*Id.* ¶ 18; *see also Clark*, 2009 UT App 252, ¶ 18, 219 P.3d 631 (following *Quinonez–Gaiton* ).

¶ 28 Marks requests that we depart from this precedent on the ground that it is in-

consistent with his Sixth Amendment rights. We decline to do so. *See generally Ewing v. Utah Dep't of Transp.*, 2010 UT App 158, ¶ 13, 235 P.3d 776 ("[T]he party requesting our departure from precedent carries a heavy burden of persuasion."), *cert. denied*, 241 P.3d 771 (Utah 2010). Despite Marks's insistence otherwise, our focus on the minimal probative value of the excluded evidence is consistent with the mandates of the Sixth Amendment. *Compare State v. Boyd*, 2001 UT 30, ¶ 43, 25 P.3d 985 (affirming the trial court's exclusion of evidence that the fifteen-year-old victim had sexual intercourse with another man the same night of the rape where "demonstrating an alternative source for some of the debris [in the victim's vaginal area] was not highly probative to the question that was before the jury, i.e., whether the intercourse was consensual"), *with Butterfield v. Cook*, 817 P.2d 333, 339–40 (Utah Ct.App.1991) (holding that the trial court did not exceed its discretion in admitting evidence of the complainant's prior sexual activity where it could explain the physical evidence that the fourteen-year-old complainant's hymen was not intact).

¶ 29 We also find that Marks's reliance on *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam), is misplaced. There, the United States Supreme Court concluded that the defendant's confrontation rights were violated when he was not permitted to cross-examine the complainant about her sexual relationship with another man who had observed her exiting the defendant's car immediately before she accused the defendant of rape. *See id.* at 233, 109 S.Ct. 480. In doing so, the Court focused on the strength of the evidence to prove that the complainant had a motive to lie, noting that the defendant "has consistently asserted that he and [the complainant] engaged in consensual sexual acts and that [she]—out of fear of jeopardizing her relationship with [her boyfriend]—lied when she told [her boyfriend] she had been raped and has continued to lie since." *Id.* at 232, 109 S.Ct. 480. While acknowledging the trial court's ability to impose reasonable limits on the defense's inquiry into potential bias, par-

ticularly where the evidence is "marginally relevant," the United States Supreme Court held that the "exclusion of cross-examination with such a strong potential to demonstrate the falsity of [the complainant's] testimony" could not be justified. *See id.* (internal quotation marks omitted).

¶ 30 Where the excluded evidence is particularly relevant, the Utah appellate courts also require that the defendant be permitted to use it for cross-examination. *See State v. Warner,* 79 Utah 510, 13 P.2d 317, 319 (1932) (holding that the trial court unduly restricted the defendant's cross-examination concerning the child complainant's discussions with her half-brother about "putting the blame on" the defendant); *State v. Chavez,* 2002 UT App 9, ¶ 20, 41 P.3d 1137 (holding that the defendant's confrontation rights were violated where the excluded evidence could "significantly lengthen the shadow to be cast on [the witness's] credibility and greatly strengthen the suggestion that he had a then-immediate motive to lie, potentially undermining his claim that he came forward of his own volition and purely out of a sense of public duty and empathy for the victim" (emphasis omitted)). Unlike the evidence at issue in these decisions, the excluded evidence here has little, if any, relevance to Grandson's motive to lie and arguably involves Grandson's prior sexual activity.

¶ 31 There is no logical link between the details of Grandson's possession of pornography and a motive to accuse Marks of sexual abuse. *See United States v. Culver,* 598 F.3d 740, 750 (11th Cir.2010) (affirming the trial court's exclusion of evidence under rule 412 and stating, "We agree with the district court that the jury did not need to hear the details of the conduct for which [the complainant] was disciplined in order for [the defendant] to have a constitutionally sufficient opportunity to impeach [the complainant]"); *see also People v. Gholston,* 26 P.3d 1, 6–8 (Colo.Ct. App.2000) (holding that defendant's confrontation rights were not violated by the trial court's exclusion of evidence that complainant first made allegations about defendant while complainant was being investigated for sexually assaulting another child). While the complainant's motive to accuse the defendant of rape in *Olden* is readily understandable because her willing participation in sex with him would negatively impact her relationship with her boyfriend, no similar motive is apparent here. *See generally State v. Tarrats,* 2005 UT 50, ¶ 45, 122 P.3d 581 ("[W]hile [the defendant] may argue that the accuser had a motive to falsely tell her friends that she had been raped [on a previous occasion] in order to preserve her relationship with her then-boyfriend, he cannot and does not argue that she has such motive to fabricate a false claim against him."). Even assuming that Grandson wished to deflect Grandmother's ire and that Marks's name was on his mind, nothing about the details of the incident supports a motive to fabricate a story about being sexually abused by Marks. *See United States v. Pumpkin Seed,* 572 F.3d 552, 560–61 (8th Cir.2009) (concluding that the defendant's confrontation rights had not been violated where the "evidence of [the complainant's] prior sexual relationship with [a] married man, offered to prove that [the complainant] feared becoming pregnant by him, had little, if any, probative value as to [the complainant's] motive to falsely accuse [the defendant] of rape").

¶ 32 Furthermore, the trial court allowed Marks to introduce evidence of the fact that Grandson was in serious trouble shortly before he accused Marks. "[W]here the defendant is provided a reasonable opportunity to adequately explore, by alternative methods, the substance of his complaints regarding the veracity of the victim's allegations, any need to disclose the victim's prior sexual conduct is substantially diminished and a trial court should ordinarily exclude it." *State v. Quinonez–Gaiton,* 2002 UT App 273, ¶ 17, 54 P.3d 139; *see also Gholston,* 26 P.3d at 8 (noting that the defendant was permitted to cross-examine child complainant regarding delay in reporting the abuse and the fact that it was first reported during the child's interview with an unidentified law enforcement officer). Marks was afforded such an opportunity, and the details of why Grandson was in trouble add little, if anything, to the argument that Grandson lied about the abuse so that Grandmother's displeasure would have a new target. Consequently, we conclude that Marks's confrontation rights were adequately

protected by his ability to cross-examine Grandson about the fact that he was in trouble shortly before he made his allegations that Marks had sexually abused him.

2. The Incident with Sister Was Not Relevant to Grandson's Ability To Fabricate the Allegations Against Marks, but Grandson's Possession of Pornography Had Some Relevance to His General Sexual Knowledge.

¶ 33 Marks next contends that he should have been permitted to cross-examine Grandson about the pornographic picture and the incident with Sister to show that Grandson had the sexual knowledge necessary to fabricate the allegation of abuse against Marks. The argument that a child complainant's prior sexual activity is admissible to rebut the jury's likely assumption that a child would not have such sexual knowledge but for the charged abuse is sometimes referred to as the "sexual innocence inference" and we use that nomenclature here for ease of reference. *See Grant v. Demskie,* 75 F.Supp.2d 201, 213–14 (S.D.N.Y.1999) (citing Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior,* 44 Cath. U.L.Rev. 709, 806 (1995); Christopher B. Reid, Note, *The Sexual Innocence Inference Theory as a Basis for the Admissibility of a Child Molestation Victim's Prior Sexual Conduct,* 91 Mich. L.Rev. 827, 829–830 (1993)).

¶ 34 The Utah Supreme Court considered the impact of the sexual innocence inference in *State v. Moton,* 749 P.2d 639 (Utah 1988), where the defendant sought to ask his ten-year-old accuser "a number of questions concerning prior sexual conduct on her part and prior fabricated sexual misconduct accusations against other persons." *Id.* at 643. Although the majority of the supreme court held that the defendant's conviction should be upheld, the justices did so for different reasons. Two of the justices held that the

trial court's exclusion of the victim's past sexual conduct did not deny the defendant the right to confront the complainant because the defendant was allowed "a plentitude of questions relevant to the victim's sexual knowledge, her past lies (including those regarding sexual matters), and possible motives for lying in the instant case." *Id.* at 644; *see also State v. Simmons,* 759 P.2d 1152, 1157 (Utah 1988) (Hall, C.J., concurring and dissenting) (concluding that exclusion of evidence concerning child complainant's prior sexual activity did not violate the defendant's confrontation rights because "defense counsel nevertheless elicited from the victim that his friends taught him the meaning of sexual phrases defendant had used"). Two concurring justices in *Moton* indicated that "the trial court may have unduly limited the cross-examination of the victim" but concluded that "sufficient evidence [of the victim's sexual sophistication] was admitted so as to make the trial court's error harmless." 749 P.2d at 644 (Zimmerman, J., concurring). However, the concurring justices also shared some of the concerns expressed in Justice Stewart's dissent, which reasoned that when a child of an age typically unfamiliar with "adult-type sexual acts" has acquired the ability to describe them from sexual experience with someone other than the defendant, "that information is clearly relevant" and the "temporary embarrassment of the child victim must ... yield to the integrity of the fact-finding process when an innocent person's liberty is at stake." *Id.* at 645 (Stewart, J., dissenting).

¶ 35 Not long after the decision in *Moton,* a panel of this court reviewed a challenge to the trial court's restrictions on the defendant's use of evidence concerning the child complainant's prior sexual experience in closing argument. In *Butterfield v. Cook,* 817 P.2d 333 (Utah Ct.App.1991),[9] information about the complainant's prior sexual relationship with her brother and her prior sexual assault by a third party was contained in a

---

9. The matter was before the court of appeals on the defendant's appeal of the district court's denial of his petition for a writ of habeas corpus. The defendant argued that his former appellate counsel rendered ineffective assistance by not raising in the defendant's direct appeal a claim

that the trial court erroneously restricted the use of evidence received at trial concerning the child complainant's prior sexual activity during closing argument. *See Butterfield v. Cook,* 817 P.2d 333, 335 (Utah Ct.App.1991).

document received into evidence. *See id.* at 338. While the defendant claimed that the restrictions on his use of that evidence in closing constituted error, the State argued that the evidence should have been excluded and that therefore, the restrictions on its use were not prejudicial. *See id.* On appeal, this court cited favorably to the premise underlying the sexual innocence inference: " '[T]he average juror would perceive the average twelve-year-old girl as a sexual innocent. Therefore, it is probable that jurors would believe that the sexual experience she describes must have occurred in connection with the incident being prosecuted; otherwise she could not have described it.' " *Id.* at 339 (quoting *State v. Howard,* 121 N.H. 53, 426 A.2d 457, 462 (1981)). The *Butterfield* court then concluded that the trial court did not exceed its discretion in admitting the evidence because the complainant's "prior experience could support petitioner's theory that she fabricated the incident, as she had the basis of knowledge for the fabrication from her prior experiences." *Id.* at 340.[10] However, the appellate court affirmed the conviction because it concluded that any restrictions on closing argument were harmless.

¶ 36 From these decisions, we conclude that Utah, like most other jurisdictions, recognizes the relevance of the complainant's past sexual conduct to rebut the sexual innocence inference in appropriate cases. *See State v. Molen,* 148 Idaho 950, 231 P.3d 1047, 1051–52 (App.2010) (collecting cases and stating that "the vast majority of courts have held that evidence of a child victim's prior exposure to sexual conduct may be relevant to show an alternative basis for the child's sexual knowledge"); *Grant,* 75 F.Supp.2d at 214–15 (collecting cases). However, as with the introduction of sexual activity evidence generally, its admission for purposes of rebutting a sexual innocence inference is highly dependent upon the facts and circumstances of the particular case.

¶ 37 As this court explained in *Butterfield,* one important consideration is the age of the child complainant at the time the child describes the sexual assault. In determining that the trial court's erroneous restrictions on the use of the complaint's prior sexual activity during closing argument was harmless, the *Butterfield* court reasoned that, first, there was strong corroborative evidence of the assault and,

> [s]econd, unlike the victim in *Moton,* who was only ten, the complainant here was fourteen. There is a difference in what a reasonable juror would understand as the sexual knowledge of a girl at fourteen, whether based on her own experience or on anecdotal information, and accordingly of her ability to fabricate if she was inclined to do so. Thus, the specifics of prior sexual experience where fabrication is the defense is much less critical with a victim of fourteen than a victim of ten.

*Butterfield,* 817 P.2d at 340. In most cases, "the probative value of evidence of a child's alternative source of sexual knowledge will .... be inversely proportional to the child's age, for the younger the child, the stronger the likelihood of a jury inference that the child would be too sexually innocent to have fabricated the allegations against the defendant." *Molen,* 231 P.3d at 1052; *see also LaJoie v. Thompson,* 217 F.3d 663, 676–77 (9th Cir.2000) (Ferguson, J., dissenting) (arguing that ten-year-old complainant "did not display a sophisticated knowledge of sexual terminology that triggered a constitutional right to present an alternative explanation for its source"); *Grant,* 75 F.Supp.2d at 217 n. 5 ("The court disagrees that a ten-year-old girl's 'basic' sexual knowledge includes a description of ejaculation."). Indeed, one commentator has suggested "a presumptive ban on the use of the sexual innocence inference theory of admissibility with children older than twelve at the time of trial." Christopher B. Reid, Note, *The Sexual Innocence Inference Theory as a Basis for the Admissibility of a Child Molestation Victim's Prior Sexual Conduct,* 91 Mich. L. Rev. 827, 852 nn. 134–38 (1993) (collecting cases).

---

10. The court also concluded that the evidence was relevant to the child's physical condition. *See Butterfield,* 817 P.2d at 339 ("[T]he physical evidence that the complainant's hymen was not intact could be explained by her prior sexual experiences....").

¶ 38 Here, the evidence was conflicting as to Grandson's age at the time of the abuse. However, it is apparent that the jury resolved that conflict in favor of the State because it convicted Marks after being properly instructed that in order to do so, it had to find beyond a reasonable doubt that Grandson was under the age of fourteen at the time of the assault. Accepting the dates as believed by the jury, Grandson was fourteen when he first disclosed the abuse to Grandmother, was interviewed at the CJC, and testified at the preliminary hearing. By the time of trial, Grandson was sixteen years old. Generally, there is less need to explain the sexual knowledge of a teenage boy than that of a younger child. Due to his mental disabilities, however, Grandson was not a typical fourteen- or sixteen-year-old child but was instead operating at the level of a much younger child in some respects. Under the unique facts of this case, we conclude—as the parties have presumed—that Marks had a legitimate interest in presenting evidence of an alternative source of Grandson's sexual knowledge. *See, e.g., Hammond v. State,* 660 So.2d 1152, 1157 (Fla.Dist.Ct.App.1995) ("Because of the mental deficiencies of these boys, the jury was likely to perceive them as naive, innocent, and unable to imagine sexual activity in detail.").

¶ 39 In considering whether evidence concerning the prior sexual conduct of the child complainant should be admitted to show the ability to fabricate the current allegations, however, most courts also consider whether the prior sexual activity is similar to that involved in the allegations against the defendant. *See, e.g., State v. Oliver,* 158 Ariz. 22, 760 P.2d 1071, 1077–78 (1988) (establishing a two-pronged analysis in which the defendant must first make an in camera showing that the prior sexual conduct occurred and then show that the prior sexual conduct was similar to the charged offense); *Molen,* 231 P.3d at 1052 (considering "the degree of similarity between the acts of which the defendant is

accused and the prior sexual activity to which the child was exposed," in determining whether the defendant's constitutional rights required admission of the evidence); *State v. Pulizzano,* 155 Wis.2d 633, 456 N.W.2d 325, 332 (1990) (requiring a defendant to show that a complainant's prior sexual experience closely resembled the sexual conduct involved in the allegations against the defendant).[11] Although considering the issue under rule 403, rather than rule 412, the Utah Supreme Court held in *State v. Tarrats,* 2005 UT 50, 122 P.3d 581, that the trial court did not abuse its discretion in concluding that "because of the factual dissimilarities between the two accusations, any probative value the recantation of the prior [rape] allegation could offer would be low and would be outweighed by its highly prejudicial nature and thus should be barred." *Id.* ¶ 19.

¶ 40 These decisions reason that dissimilar sexual activity has little relevance to a child's ability to fabricate allegations of sexual abuse against a defendant. *See Grant v. Demskie,* 75 F.Supp.2d 201, 217–18 (S.D.N.Y.1999) (collecting cases and holding on habeas corpus review that there was no constitutional error because the defendant "did not proffer evidence that the prior rape [of the child complainant] was similar to the current incident, and there was no evidence that it was relevant to explain [the complainant's] sophisticated knowledge"); *Molen,* 231 P.3d at 1052 ("Logical relevance turns upon whether the child's prior sexual experience or observation would have enabled the child to describe acts of the particular type that she now ascribes to the defendant."). We agree that this approach properly focuses on the utility of the evidence in rebutting the sexual innocence inference. For example, a limited sexual experience involving inappropriate touching of a child's buttocks does not explain the child's ability to describe sexual intercourse or fellatio. *See, e.g., Dunlap v. Hepp,* 436 F.3d 739, 745 (7th Cir.2006) (approving the

---

11. In *State v. Pulizzano,* 155 Wis.2d 633, 456 N.W.2d 325 (1990), the Wisconsin Supreme Court adopted a test that requires the defendant to establish five criteria before evidence concerning the complainant's prior sexual activity can be admitted: (1) that the prior sexual activity occurred; (2) that the conduct closely resembled the allegations in the present case; (3) that the evidence is relevant to a material issue in the present case; (4) that the evidence is necessary to the defendant's theory of defense; and (5) that the probative value of the evidence outweighs its prejudicial effect. *See id.* at 333.

Wisconsin court's exclusion under its rape shield law of evidence that the child complainant engaged in "seductive behavior" where the behavior was not factually similar to the allegations against the defendant); *United States v. Powell,* 226 F.3d 1181, 1197–99 (10th Cir.2000) (rejecting the defendant's claim that his confrontation rights were violated where the evidence of the thirteen-year-old complainant's prior inappropriate touching of men was not relevant to whether she consented to travel across country with the defendant or to engage in sexual activity with him).

¶ 41 Here, the fact that Grandson had simulated sexual intercourse with Sister does not explain his ability to describe fellatio and ejaculation. *See State v. Earl,* 252 Neb. 127, 560 N.W.2d 491, 497 (1997) (holding that evidence that the six-year-old complainant had previously simulated sexual intercourse with his five-year-old cousin was not relevant to complainant's ability to fabricate allegations that the defendant had fondled his penis and fellated him). Furthermore, there was no evidence presented that Grandson's behavior with Sister extended beyond this one event. On the contrary, Grandmother testified at the preliminary hearing that she explained to Grandson that such conduct was inappropriate and that "it hasn't happened since then." We therefore conclude that the incident with Sister is not relevant to Grandson's ability to fabricate the allegations made against Marks.

¶ 42 However, at the preliminary hearing it was less clear that the only pornography Grandson had viewed was the picture Grandmother had caught him with. After Grandmother confronted Grandson on the second occasion and admonished him not to access the "porno at [Marks's house]," Grandson explained that the picture "was an old one," and that "it just pops up on my screen." While the single picture confiscated from Grandson is not probative of a level of sexual knowledge that includes ejaculation,

erection, or fellatio, we agree with Marks that the testimony at least suggests that on other occasions pornographic material "popped up" on the computer Grandson used at Marks's house. If Grandson had viewed other pornographic images appearing on Marks's computer, it might explain a sexual knowledge broader than the conduct of the two women in the one picture Grandmother described at the preliminary hearing. Consequently, that evidence had some relevance as an alternative source of Grandson's sexual knowledge. *See State v. Martin (Martin II* ), 2002 UT 34, ¶ 34, 44 P.3d 805 (noting that "the standard for determining the relevancy of evidence is very low, and even evidence with the slightest probative value is relevant" (internal quotation marks omitted)); *see also State v. Simmons,* 759 P.2d 1152, 1155–57 (Utah 1988) (Hall, C.J., concurring and dissenting) (affirming the defendant's conviction where he was permitted to present evidence that the child complainant learned the meaning of sexual phrases from his friends and also obtained sexual knowledge from the family babysitter to establish the child's unusual ability to formulate an allegation that the defendant caused the child to put his mouth on the defendant's penis); *State v. Moton,* 749 P.2d 639, 641, 644 (Utah 1988) (affirming the trial court's decision to allow the defense to question the ten-year-old complainant about her knowledge of sexual anatomy and her understanding of the act of fellatio where she had accused the defendant of licking her genital area, sucking her breasts, and attempting to bribe her into licking his genitals).

¶ 43 In summary, we conclude that neither the incident with Sister nor the possession of the specific pornographic picture described by Grandmother were probative of an alternative source of Grandson's knowledge of the type of sexual activity reported. However, his access to pornographic pop-ups at Marks's house may have had some relevance to his general level of sexual sophistication.[12]

12. The State also argues that the incident with Sister and Grandson's possession of pornography could not be alternative sources of knowledge allowing Grandson to fabricate the allegations of abuse because these incidents occurred after the abuse and may have been prompted by sexual curiosity provoked by it. We agree with Marks, however, that the relevant inquiry for purposes of assessing the value of this evidence is whether it occurred before the complainant made the

3. Both Incidents Are Relevant to Grandson's Truthfulness.

██ ██ ¶ 44 Finally, Marks contends that Grandson's prior sexual conduct was important for impeachment of Grandson's credibility on the basis of his truthfulness. At the preliminary hearing, Grandson denied that he had viewed pornography or touched anyone inappropriately. In contrast, Grandmother testified at the preliminary hearing that before Grandson watched the television show on sexual abuse, he had been involved in the incident with Sister and twice caught with pornography. Thus, Marks contends that Grandson's false statement should be exempted from rule 412, much like false allegations of rape. However, we see a significant difference between evidence that the complainant previously fabricated charges similar to those now made against a defendant and evidence of actual sexual conduct offered solely to prove untruthfulness. Where prior rape allegations are untrue, they may not involve sexual conduct at all and thus do not fall within the scope of rule 412. *See State v. Tarrats*, 2005 UT 50, ¶ 23, 122 P.3d 581 (stating that rule 412 does not exclude "[e]vidence offered to prove allegedly false prior claims by the victim" (alteration in original) (quoting Utah R. Evid. 412 advisory comm. note)). Here, Marks seeks to introduce the testimony of Grandmother concerning the pornography and the incident with Sister not to show that they never happened but to establish that Grandson was untruthful when he denied them. Thus, this is not a situation such as a prior false allegation of sexual assault, where the protections of rule 412 are inapplicable because the evidence does not relate to sexual conduct.

¶ 45 Nevertheless, we are equally unpersuaded by the State's argument that we should reject outright Marks's claim that the evidence is relevant to Grandson's truthfulness under the Utah Supreme Court's decision in *State v. Boyd*, 2001 UT 30, 25 P.3d

985. There, the defendant argued that rule 412 did not govern the admissibility of evidence that the complainant engaged in consensual sexual intercourse with someone other than the defendant on the night of the rape. *See id.* ¶ 37. The defendant advanced two theories for that argument. First, the defendant claimed that the evidence could be used to impeach the complainant's testimony that the defendant "took something from [her] that [she] can't ever take back," which he interpreted as being a false statement that she was a virgin at the time of the assault. *See id.* ¶ 33 (internal quotation marks omitted). Second, the defendant claimed that the prior encounter was offered to prove that " 'a person other than the accused was the source of the . . . injury, or other physical evidence.' " *Id.* ¶ 38 (omission in original) (quoting Utah R. Evid. 412(b)(1)). The *Boyd* court agreed that the evidence was relevant to the source of "other physical evidence" and therefore was expressly excepted from the rule. *See id.* In a footnote, the *Boyd* court rejected the defendant's alternative argument that evidence offered for impeachment purposes is similarly exempted from the scope of the rule, stating, "There is no exception in rule 412 that allows for the admission of past sexual conduct to impeach witnesses." *Id.* ¶ 38 n. 4. Thus, the footnote merely reflects the supreme court's agreement with the advisory committee notes that rule 412 presumptively excludes evidence of the complainant's prior sexual activity, even if such evidence is offered for impeachment purposes. *See* Utah R. Evid. 412 advisory comm. note (excluding evidence of the complainant's sexual conduct, "whether offered as substantive evidence or for impeachment, except in designated circumstances"). There is nothing in the supreme court's decision in *Boyd*, however, that suggests evidence offered for impeachment purposes must be categorically excluded if to do so would violate the defendant's constitutional rights.[13] *See*

---

allegations against the defendant. The defense theory is that these other activities gave Grandson the ability to fabricate allegations against Marks and that all aspects of the claims are false, including Grandson's account of when it occurred.

13. As the advisory committee note to rule 412 indicates, the exception in "[s]ubparagraph (b)(3) states a truism" in that the rule cannot be used to exclude otherwise admissible evidence where the defendant has a constitutional right to the use of that evidence in the presentation of a complete defense. *See* Utah R. Evid. 412 adviso-

*Boyd,* 2001 UT·30, ¶ 28, 25 P.3d 985 (*"As a general rule,* newly discovered evidence does not warrant a new trial where its only use is impeachment." (emphasis added)).

¶ 46 Marks claims that the fact that Grandson testified falsely at the preliminary hearing was "important for impeachment" because it would have countered the State's claim that Grandson is "honest[ ] and incapable of telling a convincing lie." Marks further contends that the only evidence against him was the uncorroborated testimony of Grandson, and therefore, Grandson's prior untruthfulness at the preliminary hearing makes it less probable that the abuse actually occurred. We agree that the evidence has some relevance. *See Martin II,* 2002 UT 34, ¶ 34, 44 P.3d 805 (explaining that the standard for relevance is low).

¶ 47 In sum, with regard to the evidence of Grandson's prior sexual behavior, we conclude that neither incident is relevant to Grandson's motive to fabricate allegations against Marks. We further determine that while the incident with Sister has no relevance to Grandson's ability to fabricate allegations that Grandfather orally sodomized him, the inference that Grandson may have been exposed to more extensive pornographic images while using Marks's computer may have some relevance on the issue of Grandson's sexual knowledge. Finally, both incidents have some relevance to the issue of Grandson's credibility. Thus, we must now consider whether, in light of that relevance, the exclusion of the evidence was disproportionate to the purposes of rule 412. To do so, we first address the goals of rule 412 and whether the exclusion of the particular evidence is consistent with those goals. We next analyze the extent to which the exclusion of the evidence will further these goals. Finally, we determine whether the exclusion of the evidence under the facts present here is disproportionate to the purposes of the rule. In doing so, we consider whether admission of the evidence was needed to advance a complete defense.

## B. The Purposes of Rule 412

¶ 48 The goals of rule 412 include the following: protecting victims of sexual assault from humiliation, encouraging victims to report sexual crimes, and preventing the introduction of "irrelevant and collateral issues that may confuse or distract the jury," *see Tarrats,* 2005 UT 50, ¶¶ 20, 24, 122 P.3d 581. The rule also " 'safeguards the alleged victim from the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the fact finding process.' " *Boyd,* 2001 UT 30, ¶ 46, 25 P.3d 985 (quoting Utah R. Evid. 412 advisory comm. note). In addition, rule 412 is designed to protect the complainant from prejudice or hostility. *See Tarrats,* 2005 UT 50, ¶ 21, 122 P.3d 581 (noting that, even where it has some relevance, evidence of the complainant's past sexual history "has an unusual propensity to unfairly prejudice, inflame, or mislead the jury and is likely to distort the jury's deliberative process" (internal quotation marks omitted)). We now consider these purposes in connection with the evidence excluded by the trial court.

### 1. Exclusion of the Sexual Simulation Evidence Is Consistent with the Purposes of Rule 412.

¶ 49 Undoubtedly, evidence that Grandson was discovered pretending to have sexual intercourse with his seven-year-old sister is disturbing. However, we view the likelihood of sexual stereotyping associated with such evidence differently than when the prior sexual activity of an adult is at issue. The jury might consider these activities a manifestation of sexual curiosity, a result of being exposed to age-inappropriate material, or a reaction to prior abuse. Indeed, where children are involved, evidence of past sexual activity seems likely to create sympathy, concern, or anger on their behalf, rather than hostility.[14] When children are sexual-

14. For that reason, a small minority of jurisdictions have concluded that involuntary sexual conduct, including any sexual activity experienced by a child, "is not evidence of unchastity

ized, it is not the fault of the child but of some adult, either by intentional acts of abuse directed at that child (or at another child who then mimics the inappropriate behavior), or by careless exposure of the child to age-inappropriate material. We are confident that reasonable jurors are aware of that distinction. Even assuming that the potential for hostility may be greater when one child has involved another child in sexual conduct, we consider the danger of such prejudice here as minimal in light of Grandson's mental disabilities.

¶ 50 Nevertheless, the likely impact on a child of having these private matters made public is apparent. A child is likely to be confused and frightened about the past experience, the child may have inadequate vocabulary to discuss it, and the stress of confronting those memories may increase the likelihood that the child will be unable to testify competently about the current allegations. Furthermore, a parent who has already seen the emotional impact on his son or daughter caused by the abuse itself may be unwilling to subject the child to the additional trauma of being questioned about earlier victimization. For these reasons, we conclude that rule 412's goal of protecting victims of sexual crimes from embarrassment and humiliation, and of encouraging them to report the crimes, are strongly implicated when the complainant is a child.

¶ 51 Here, the risk that Grandson, as well as Sister, would suffer embarrassment and humiliation as a result of the public disclosure of their behavior is great. Furthermore, the incestuous nature of the conduct, the risk of a preexisting stigma due to Grandson's mental disabilities, and Sister's young age increase these concerns. Thus, we conclude that the sexual-simulation incident is precisely the type of evidence rule 412 was designed to exclude.

¶ 52 One of rule 412's other purposes is to avoid the introduction of irrelevant evidence that will unduly consume time and confuse the issues. *See State v. Tarrats,* 2005 UT 50, ¶ 24, 122 P.3d 581. Because the jury might engage in speculation about what prompted

the incident with Sister, admission of the evidence could result in confusion of the issues to be decided, as well as "the infusion of sexual innuendo into the fact finding process," *see State v. Boyd,* 2001 UT 30, ¶ 46, 25 P.3d 985. Furthermore, both the prosecution and the defense may have focused measurable time and effort on developing the facts surrounding the tangential incident with Sister. And while Grandmother could provide testimony concerning her observations, only embarrassing and intrusive questioning of the children could reveal what actually triggered their conduct.

¶ 53 Additionally, as the trial court correctly noted, Grandson had testified inconsistently on a number of occasions about his age, to whom he disclosed the abuse, and the details of what occurred between him and Marks. The fact that Grandson is easily confused, struggles with the months of the year, and has other memory lapses relevant to his ability to relate events truthfully could be explored by the defense without going into the details of the sexual-simulation incident. For all of these reasons, we conclude that despite our determination that the inconsistencies regarding Grandson's sexual experience has some relevance for impeachment purposes, the trial court's exclusion of the evidence relating to the incident with Sister was consistent with the purposes of rule 412.

2. Although Consistent with the Purposes of Rule 412, the Exclusion of the Evidence of Grandson's Access to Pornography Does Not Implicate Those Purposes to the Same Extent as the Evidence of the Incident with Sister.

¶ 54 At the time of trial, Grandson was sixteen years old, with the mental capacity of a third- or fourth-grade student. In light of his age and mental disabilities, it seems unlikely that the jury would judge Grandson harshly for being curious about naked women. Nevertheless, while not as shocking as the incident with Sister, use of Marks's computer to view and retain at least one pornographic picture is not something that Grandson is likely to want made public. The public

---

and therefore is not 'sexual conduct' within the ambit of state rape shield laws." *See, e.g., Grant*

*v. Demskie,* 75 F.Supp.2d 201, 212 (S.D.N.Y. 1999) (collecting cases).

discussion of that fact may have caused Grandson some humiliation and embarrassment, thereby discouraging other sexual assault victims from coming forward.

¶ 55 There is also some risk that the jury would become confused and equate Grandson's use of Marks's computer to download pornography as proof that Marks condoned such conduct. Despite that risk, however, we do not believe it would be difficult to clarify the matter for the jury. The presentation of the evidence necessary to inform the jury of Grandson's possession of the pornography and how he obtained it, and to dispel any confusion about Marks's complicity in its acquisition, could be presented with little additional burden and would prevent the jury from being "confuse[d] or distract[ed]" by "collateral issues," *see Tarrats*, 2005 UT 50, ¶ 24, 122 P.3d 581.

¶ 56 In addition, unlike the incident with Sister, Grandson's exposure to pornographic images is not direct evidence of his sexual activity.[15] *But see* Utah R. Evid. 412 advisory comm. note (indicating that sexual behavior "includes mental activities, such as fantasies or dreams"). Nor is it an activity "that impl[ies] sexual intercourse or sexual conduct," which includes "evidence of a victim's use of contraceptives, affliction with a venereal disease, or mothering of an illegitimate child." *See Tarrats*, 2005 UT 50, ¶ 22, 122 P.3d 581; *see also* Utah R. Evid. 412 advisory comm. note (listing the same examples and providing citations for each). Rather, it may instead fall within rule 412's exclusion of "evidence that does not directly refer to sexual activities or thoughts but that may have a sexual connotation for the fact finder." *Id.* The different nature of the conduct involved may impact the extent to which the evidence of it must be excluded in order to effectuate the purposes of the rule. The early decisions

of the Utah Supreme Court are illustrative of this difference.

¶ 57 Prior to the adoption of rule 412 of the Utah Rules of Evidence, although evidence of the complainant's past sexual activity was excluded under rule 403, other evidence of general sexual sophistication was admitted to allow the accused to refute the sexual innocence inference. *See State v. Simmons*, 759 P.2d 1152, 1156–57 (Utah 1988) (Hall, C.J., concurring and dissenting) (permitting cross-examination about the child complainant's sexual knowledge obtained from sources other than prior sexual experience); *State v. Moton*, 749 P.2d 639, 641–42 (Utah 1988) (affirming the defendant's conviction where, although the trial court prohibited cross-examination of the ten-year-old complainant concerning her prior sexual experience, it permitted the defense to question the child about her sexual knowledge); *Butterfield v. Cook*, 817 P.2d 333, 340 (Utah Ct.App.1991) (holding that error in restricting closing argument was harmless where jury heard evidence that the complainant "was exposed to adult oriented videos including the pornographic movie playing the night of the incident"). In determining whether evidence of a sexual nature should be excluded under rule 403, Utah courts balanced the same competing interests between the accused's right to confrontation and the protection of the complainant that are relevant to whether the exclusion of the evidence would be appropriate under rule 412. Therefore, we find these pre-rule 412 cases supportive of a less-restrictive view of admissibility where the evidence of the child complainant's atypical sexual sophistication does not involve the child's prior engagement in sexual activity.

¶ 58 Applying that distinction to the facts of the case, we conclude that while both the pornography incident and the behavior with

---

15. While Marks has not challenged this issue, not all courts agree that evidence such as viewing pornography falls within the scope of rule 412. *See, e.g., State v. Mason*, 219 Ill.App.3d 76, 161 Ill.Dec. 705, 578 N.E.2d 1351, 1353 (1991) ("[T]he rape-shield statute applies to 'prior sexual activity' or 'reputation.' The viewing of pornographic videotapes by a curious seven year old does not constitute evidence of either."); *People v. Arenda*, 416 Mich. 1, 330 N.W.2d 814, 818 (1982) (distinguishing the child victim's "sexual conduct with others," which is inadmissible un-

der Michigan's rape shield law, from sexual knowledge gained from other experiences such as "reading a book, seeing a movie, conversing with others, schoolwork or witnessing others engaged in such activity"). *But see Payne v. State*, 267 Ga.App. 498, 600 S.E.2d 422, 424 (2004) (analyzing evidence that child complainant viewed a pornographic movie as "part of her sexual history or behavior," which was presumptively inadmissible under Georgia's rape shield law).

Sister may fall within the scope of rule 412's exclusionary presumption, the purposes of the rule are more strongly implicated with respect to the incident of sexual simulation.[16] *Cf. State v. Martin (Martin II )*, 2002 UT 34, ¶ 42, 44 P.3d 805 ("While we acknowledge that rule 412 should be construed broadly in order to fully effectuate the policy considerations underlying its prohibitions, we refuse to extend the rule's circumference of influence to evidence as sexually innocuous as that at issue here [where the complainant accepted a ride from a stranger on a prior occasion].").

### C. The Impact of the Exclusion of the Evidence on Marks's Right To Confront Grandson

¶ 59 We now consider whether the exclusion of the evidence was arbitrary or disproportionate to the purposes of the rule in light of Marks's right to present a complete defense. *See State v. Tarrats*, 2005 UT 50, ¶¶ 35–37, 122 P.3d 581. Because we have previously determined that neither the sexual-simulation evidence nor Grandson's access to pornography are relevant to his motive to make false allegations against Marks, we do not further consider Marks's right to present the evidence for that purpose. Likewise, we have concluded that there is nothing about the incident with Sister or the possession of a picture of two naked women that explains Grandson's ability to make the particular allegations against Marks at issue here. Thus, for purposes of our analysis of whether the exclusion of the evidence was arbitrary or disproportionate to the purposes of rule 412, we consider only Marks's claim that the evidence that Grandson accessed pornography was relevant to show Grandson's more general sexual knowledge and to attack his truthfulness.

### 1. The Exclusion of the Evidence that Grandson May Have Had Access to Internet Pornography, Offered To Show His Sexual Knowledge, Was Not Disproportionate to the Purposes of Rule 412.

¶ 60 As discussed, the protections afforded by rule 412 may be less critical with respect to the evidence concerning Grandson's perusal of pornographic pop-ups at Marks's house than with respect to the sexual-simulation incident. Although under some circumstances a defendant may have a right to offer such evidence to rebut the sexual innocence inference, we agree with the trial court that this is not such a case.

¶ 61 First, Marks seems to argue that he should have been permitted to ask the jury to infer from Grandson's possession of the picture of the naked women, obtained from the internet, that he had been exposed to pornography more generally. Without some foundational information, however, this inference is extremely weak. The defense here did not seek or proffer the additional evidence necessary to lay such a foundation. *Cf. Grant v. Demskie*, 75 F.Supp.2d 201, 217–18 (S.D.N.Y.1999) ("[B]ecause [the defendant] did not proffer evidence that the prior rape was similar to the current incident, and there was no evidence that it was relevant to explain [the complainant's] sophisticated knowledge of an erection and ejaculation, the trial judge did not commit constitutional error by excluding evidence about the prior rape." (footnote omitted)). For example, the defense did not ask for clarification from Grandmother about the "porno at [Marks's] house," or from Grandson about how "it just pops up on [his] screen." As a result, there is nothing in the record to indicate how often such pornographic pop-ups appeared, whether Grandson studied them on any other occasions, or the types of sexual activity they depicted. In other words, there was no evidence presented or proffered that Grandson had viewed pornography on more than the two occasions on which Grandmother caught him with a picture of naked women. Thus, there is likewise no evidence that Grandson viewed sexual materials that would have given him a basis for fabricating the specific allegations that he made against Marks. Although Marks claims he was stymied in his attempts to explore Grandson's sexual knowl-

---

**16.** The trial court recognized this difference with respect to rule 403, stating that "because the evidence lacks probative value but would be highly prejudicial (especially evidence of the incident with [Grandson] and his sister), the evidence should also be excluded under rule 403."

edge due to the false testimony at the preliminary hearing, the defense did nothing to attempt to refresh Grandson's memory by calling his attention to pop-ups on Marks's computer or to explore Grandmother's reference to "the porno at [Marks's] house." *Cf. State v. Warner*, 79 Utah 510, 13 P.2d 317, 319 (1932) (noting defense counsel's extensive efforts to obtain confirmation from the complainant that she and her half-brother had discussed making allegations against the defendant). Consequently, the trial court, as well as the jury, could only speculate as to the relevance of Grandmother's testimony about the "porno at [Marks's house]" to Grandson's ability to describe the events he claimed occurred with Marks.

¶ 62 In addition, the trial court's ruling was made, in part, in reliance on the representation that Marks intended to provide expert testimony designed to dispel the notion that mentally disabled persons are sexually naive.[17] In light of Grandmother's vague references to pop-ups on Marks's computer and the assurance that the defense was prepared to provide expert testimony indicating that persons with mental disabilities are not necessarily sexually naive, the trial court correctly determined that the evidence was only marginally relevant to Grandson's ability to fabricate the allegations against Marks. We therefore conclude that exclusion of the evidence offered for that purpose was not disproportionate to the goals of rule 412 because those goals were implicated and the probative value of the proposed evidence was low.

2. The Exclusion of the Evidence Concerning the Incident with Sister and Grandson's Access to Pornography, Offered To Impeach Grandson, Was Not Disproportionate to the Purposes of Rule 412.

¶ 63 Marks further contends that by excluding the evidence that Grandson lied at the preliminary hearing, the trial court unconstitutionally prohibited him " 'from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose the jury to the facts from which it could appropriately draw inferences relating to the reliability of witnesses.' " *State v. Clark*, 2009 UT App 252, ¶ 16, 219 P.3d 631 (alterations omitted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)), *cert. denied*, 225 P.3d 880 (Utah 2010). Marks calls our attention to the fact that there is no physical or other corroborative evidence of the abuse. Because the critical issue to be decided by the jury was whether Grandson's uncorroborated allegations were truthful, Marks contends that the evidence should have been admitted to challenge Grandson's credibility. *See generally State v. Martin (Martin II )*, 2002 UT 34, ¶ 33, 44 P.3d 805 (stating that where both the defendant and the complainant testified, giving vastly different versions of their sexual encounter, the "central issue" at trial was "whom to believe" (internal quotation marks omitted)). We are not convinced that Marks had a constitutional right to present the evidence of Grandson's access to pornographic pop-ups or the incident with Sister for this purpose.

¶ 64 First, nothing about Grandson's prior untruthful testimony would have exposed the jury to *facts* supporting an inference that Grandson's testimony about the abuse was untruthful. *See Clark*, 2009 UT App 252, ¶ 16, 219 P.3d 631. Rather, the defense offered the evidence to establish that because Grandson lied under oath at the preliminary hearing as to a different topic, he was likely also lying about the abuse at trial. We are not convinced that this is the type of prototypical cross-examination that requires introduction of the evidence in light of the purposes underlying rule 412. *Cf. State v. Boyd*, 2001 UT 30, ¶ 28, 25 P.3d 985 ("As a general rule, newly discovered evidence does not warrant a new trial where its only use is impeachment."). Proof that Grandson viewed pornography on a previous occasion or engaged in simulated sex does not call into question the accuracy of any of the details of Grandson's description of the abuse. *Cf. State v. Lenkart*, 2011 UT 27, ¶ 41, 262 P.3d 1 (noting that the new evidence "strongly corroborated [the defendant's] testimony," and "would have provided an alternative ex-

17. Despite that assurance, the defense did not elicit such testimony from its expert at trial.

planation" for evidence supporting the complainant's testimony that she did not consent); *Martin II*, 2002 UT 34, ¶ 49, 44 P.3d 805 (holding that the defendant was entitled to a new trial on charges of rape where newly discovered evidence that the complainant had accepted a ride with a stranger on a previous occasion had a "reasonable likelihood of both discrediting [the complainant's] testimony [that the defendant forced her to enter his vehicle at gun point] and making [the defendant's] version of events [that she willingly went for a ride] more credible"). Therefore, the trial court concluded that Marks could adequately challenge Grandson's truthfulness and other aspects of his credibility by questioning Grandmother without raising Grandson's sexual experiences, and by cross-examining Grandson on the inconsistencies among his descriptions of the timing and the details of the encounter with Marks.

¶ 65 Although decided under rule 403 before Utah adopted rule 412, the Utah Supreme Court's opinion in *State v. Williams*, 773 P.2d 1368 (Utah 1989), provides a helpful analysis of whether a complainant's prior untruthful statements about her sexual history can be used for impeachment purposes. There, the defendant claimed that his confrontation rights were violated when the trial court excluded evidence that his alleged rape victim had twice lied about consensual sexual activity with another man on the same night. *See id.* at 1369–70. The defendant argued that the evidence was relevant, among other purposes, to show that the complainant lacked credibility. *See id.* The supreme court disagreed, holding that the trial court did not exceed its discretion in excluding the evidence under rule 403, both because "the trial court prudently considered the reasons behind the victim's lapse of integrity" and because the defendant "was permitted to cross-examine the victim about some of her inconsistent statements to the police." *Id.* at 1371. The *Williams* court explained that the trial court had not "prohibited *all* inquiry into the possibility that the victim lacked credibility or that the facts could have been as defendant claimed." *Id.* at 1373 (footnote omitted). Rather, defense counsel "cross-examined the victim, and defendant took the stand and developed his theory of the case. In both contexts, defendant had an opportunity to attack the credibility of the complainant and challenge her veracity." *Id.* Consequently, the supreme court concluded that "[t]he exclusion of evidence of the victim's consensual intercourse did not deprive defendant of his constitutional confrontation rights." *Id.*

¶ 66 As in *Williams*, the defense here cross-examined Grandson concerning the inconsistencies in his versions of the allegations against Marks. While Marks did not take the stand, he had the opportunity to do so. And the defense provided expert testimony on the "various red flags," raised by the "significant difference[s]" in Grandson's description of "core and salient" events concerning the "episode of sexual abuse." The defense's expert also testified concerning the impact of a mental disability on the person's capacity to lie, stating, "the bottom line, clinically, is a young person with a mild cognitive impairment is as capable as you and I of being truthful. And as capable as you and I of being deceptive." During closing argument, defense counsel reminded the jury of the "great deal of conflict in [Grandson's] testimony when he talks about when he made this allegation against [Marks]"; that Grandson is so "eager to please" that "when a person stands up that wants something else from him, he changes [his testimony] and he changes it back again"; and that the inconsistencies in his description of the abuse reflect his inability to tell a convincing lie due to his disability. Indeed, the defense quoted from conflicting portions of Grandson's testimony to illustrate those discrepancies.

¶ 67 Under these circumstances, we agree with the trial court that the exclusion of the evidence that Grandson denied viewing pornography and touching anyone inappropriately at the preliminary hearing did not violate Marks's confrontation rights. The defense adequately focused the jury on Grandson's lack of credibility by highlighting the other inconsistencies in his statements, including contradictory testimony given under oath directly related to the allegations against Marks. Because Marks was "provided a reasonable opportunity to

adequately explore, by alternative methods, the substance of his complaints regarding the veracity of [Grandson's] allegations, any need to disclose [Grandson's] prior sexual conduct [was] substantially diminished." *See State v. Quinonez–Gaiton*, 2002 UT App 273, ¶ 17, 54 P.3d 139 (citations omitted). Therefore, the trial court properly denied Marks's pretrial request to use the evidence of Grandson's possession of pornography and the incident with Sister for impeachment purposes.

### 3. Marks Did Not Ask the Trial Court To Reconsider Its Ruling Based on Events at Trial.

¶ 68 Even if the trial court's pretrial ruling was correct, Marks contends that he was entitled to offer the evidence of Grandson's dishonesty at trial because "it would have countered the State's claim that Grandson was sexually innocent, honest, and incapable of telling a convincing lie." Although not decided under rule 412, our supreme court considered a similar argument in *State v. Martin* (*Martin II* ), 2002 UT 34, 44 P.3d 805. There, the defendant was convicted of rape, aggravated kidnapping, and forcible sodomy based on the complainant's testimony that the defendant had abducted her from a grocery store parking lot. *See id.* ¶¶ 3, 23. At trial, the defendant testified that he approached the complainant after they "exchanged eye contact" in the store and that she voluntarily went for a ride and consented to sexual activity. *See id.* ¶¶ 13–20. There was no physical evidence of forcible sexual contact, and the central issue of the case was "whose version of events to believe." *Id.* ¶ 38. The State urged the jury to accept the complainant's account because it comported with common sense that she would not have entered the vehicle of a stranger willingly. *See id.* In support of that argument, the State introduced evidence of the complainant's "character as a dependable and responsible individual," including testimony from the complainant's sister. *See id.* The jury found the defendant guilty, and the trial

court denied his motion for a new trial. *See id.* ¶¶ 23, 27.

¶ 69 On appeal, the Utah Supreme Court remanded for additional discovery. *See id.* ¶ 51. That discovery revealed that the complainant had made a prior rape allegation based on an incident that had allegedly occurred after she accepted a ride from a stranger. *See id.* ¶ 25; *see also State v. Martin* (*Martin I* ), 1999 UT 72, ¶ 16, 984 P.2d 975 (remanding for further discovery). Based on that evidence, the defendant again moved for a new trial. *See Martin II*, 2002 UT 34, ¶ 26, 44 P.3d 805. The trial court denied the defendant's motion, concluding that the newly discovered evidence was impermissible "character propensity evidence," namely, "that because [the complainant] had previously gotten into a stranger's car willingly, she must have conducted herself similarly in this case." *See id.* ¶ 27 (internal quotation marks omitted). The defendant again appealed. *See id.* ¶ 28.

¶ 70 In *Martin II*, the supreme court acknowledged that "rule 404 prohibits introduction of evidence concerning 'a person's character or a trait of character . . . for the purpose of proving action in conformity therewith on a particular occasion.' " *Id.* ¶ 36 (omission in original) (quoting Utah R. Evid. 404(a)); *see also State v. Vargas*, 2001 UT 5, ¶ 34 n. 11, 20 P.3d 271 (indicating in dicta that evidence that a prosecution witness lied on a previous occasion was likely properly excluded under Utah Rule of Evidence 608(b) as inadmissible extrinsic evidence of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility" (quoting Utah R. Evid. 608(b))). However, the supreme court explained that the State had "placed [the complainant's] character into question" by introducing evidence that she was responsible and dependable and by arguing that "responsible people do not willingly enter the vehicle of a stranger only moments after initially encountering the individual." [18] *Martin II*, 2002 UT 34, ¶ 38, 44

---

**18.** The *Martin II* court also held that rule 412 would not have barred admission of the evidence because "the evidence of [the complainant] accepting a ride from a stranger . . . simply possesses no sexual connotation, insinuation, or overtone." 2002 UT 34, ¶ 42, 44 P.3d 805. Indeed, the defense in *Martin II* clarified that it

P.3d 805. Noting that rule 404(a) allows a criminal defendant "to attempt to discredit, with evidence of 'specific instances of conduct,' testimony of an alleged victim's relevant character once it had been introduced," the supreme court concluded that rule 404(a) did not preclude admission of the evidence. *See id.* ¶ 38; *see also* Utah R. Evid. 404(a)(2).[19]

¶ 71 Like the defendant in *Martin II,* Marks contends that evidence of Grandson's untruthfulness at the preliminary hearing should have been admitted to challenge Grandson's credibility because the prosecution placed Grandson's character for truthfulness at issue at trial. *See State v. Lenkart,* 2011 UT 27, ¶ 41, 262 P.3d 1 (noting that the "prosecutor heavily referenced and emphasized the testimony throughout the proceedings"). In support of that argument, Marks points us to testimony elicited at trial, including, Uncle's statement that Grandson "doesn't make up lies and he's a good kid"; Grandson's special education teacher's indication that Grandson "was a very pleasant, compliant child" who was "[a]nxious to please," and her opinion that children with mental disabilities are terrible at lying because "they take it over the top"; and the State's expert's observation that Grandson's attestation of his own truthfulness, made while he was alone during the CJC interview but still being recorded, "was very telling of his state of mind." [20]

¶ 72 Marks also relies on comments made during closing argument. He notes that the prosecutor read the transcript from the CJC interview to the jury where Grandson states, "I told my grandma I wasn't too scared to

tell the truth. I wouldn't lie to police because my grandma told me how bad that is to lie to people. I told the truth because I never lie. Well, I do, but not with people like this I don't lie to." After reading Grandson's statement, the prosecutor commented, "And [Grandson] is honest. He makes a point of saying, 'I wouldn't lie to the police.'" The prosecutor then argued that Grandson's comments were a "window of what's going on in [Grandson's] mind," and that "[t]here is just no evidence that [Grandson] is lying in this case." Based on these events at trial, Marks argues that the State put Grandson's truthfulness at issue and the evidence that Grandson lied was critical to his defense.

■ ¶ 73 We agree with Marks that subsequent developments may affect the continuing wisdom of a pretrial rule 412 decision and that this may be a case where reassessment of the trial court's in limine ruling would have been appropriate. *See State v. Kirkwood,* 2002 UT App 128, ¶ 14, 47 P.3d 111 ("By its nature, an in limine ruling is subject to change by the trial court." (citing *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984))); *see also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 233 (2009–2010 ed.) ("Because Utah's rape shield law excludes otherwise relevant and admissible evidence, the prosecutor must be careful not to abuse the protection afforded by the statute by implying that the victim is more sexually pure than the facts suggest. A false innuendo raised by the prosecution may constitute a waiver of the rape shield.").[21] *But see State v. Boyd,* 2001 UT 30, ¶ 46, 25 P.3d

---

"did not intend to introduce any evidence of [the complainant's] past sexual activity." *Id.* ¶ 41.

19. Rule 404(a) provides in relevant part, "(a) *Character evidence generally.* Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: ... (a)(2) *Character of Alleged Victim.* Evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused ... to rebut the same...." Utah R. Evid. 404(a)(2).

20. The record indicates, however, that some of the testimony of which Marks complains was

elicited in response to questions from the defense.

21. The Missouri Court of Appeals agrees. *See State v. Samuels,* 88 S.W.3d 71, 82–83 (Mo.Ct. App.2002) (holding that the prosecutor's comments in opening statement about the nine-year-old complainant's unusual sexual knowledge created an inference that the allegations against the defendant were the source of that knowledge and, therefore, the trial court should not have denied the defendant's repeated attempts at trial to present evidence of the child's prior sexual experience to explain that sexual knowledge, despite the trial court's pretrial exclusion of the evidence under rule 412).

985 (rejecting the defendant's argument that the prosecution waived the protections of rule 412 when its expert suggested that the complainant was a virgin before the rape and stating, "the safeguards of rule 412 are for the benefit of the victim herself . . . and only she could have waived them"). However, we need not decide whether subsequent events should have altered the analysis concerning the admission of the rule 412 evidence here because Marks did not ask for any relief in response to the testimony at trial or the prosecutor's closing argument.[22] *See State v. Dibello,* 780 P.2d 1221, 1226 (Utah 1989) ("Whatever merit there may be to this claim of error, the fact is that the defense made no objection at trial to these remarks.").

¶ 74 Although the Utah Rules of Evidence provide that a party need not renew an objection to preserve a claim where the trial court has made a definitive ruling on the admissibility of the evidence at or before trial, *see* Utah R. Evid. 103(a)(2), Marks relies on events that occurred after the trial court made that in limine ruling. In order to give the trial court an opportunity to correct the error he now claims, Marks was required to renew his request after the events he claims heightened the need for the evidence had occurred. *See State v. Cram,* 2002 UT 37, ¶ 9, 46 P.3d 230 ("[T]he doctrine of waiver has application if defendants fail to raise claims at the appropriate time at the trial level, so the judge has an opportunity to rule on the issue." (internal quotation marks omitted)); *see also State v. Samuels,* 88 S.W.3d 71, 83 (Mo.Ct.App.2002) (rejecting the defendant's challenge to the exclusion of evidence of the nine-year-old complainant's sexual activity with others based on comments in the prosecution's closing argument inferring that she gained her unusual sexual knowledge as a result of the defendant's conduct where the defense failed to object at the earliest possible opportunity). Consequently, we limit our consideration of Marks's claim on appeal that

the evidence was necessary to impeach Grandson's truthfulness to the facts known to the trial court at the time of its ruling. *See IHC Health Servs., Inc. v. D & K Mgmt., Inc.,* 2008 UT 73, ¶ 36, 196 P.3d 588 (rejecting appellant's claim that the trial court's decision was clearly erroneous due to appellant's failure "to show that the district court should have ruled in its favor based on the law and evidence before it at the time of the decision"). Under those facts, we agree with the trial court that Marks should have been able to attack Grandson's credibility adequately by pointing out the inconsistencies among Grandson's versions of events.

¶ 75 Based on the foregoing, we conclude that the exclusion of the evidence was not arbitrary and did not exceed the purposes of rule 412. We also hold that the trial court acted within its discretion in the application of the rule.[23]

## II. Motion To Dismiss

¶ 76 Marks further argues that the State failed to make out a prima facie case against him because Grandson's testimony was too inconsistent to provide sufficient evidence that abuse occurred and because the evidence was insufficient to prove that Grandson was under the age of fourteen at the time of the incident.

¶ 77 A conviction must be based on " 'substantial reliable evidence.' " *State v. Robbins,* 2009 UT 23, ¶ 14, 210 P.3d 288 (quoting *State v. Ramsey,* 782 P.2d 480, 483 (Utah 1989)). Thus, even "[t]hough the court must ordinarily accept the jury's determination of witness credibility, when the witness's testimony is inherently improbable, the court may choose to disregard it." *Id.* ¶ 16 (citing *State v. Workman,* 852 P.2d 981, 984 (Utah 1993)). Inherently improbable testimony is either "(1) physically impossible or (2) apparently false." *Id.* (citing *Workman,* 852 P.2d

---

22. When the defense did object, the trial court was responsive to its concerns. For example, during direct examination, the State's expert began to opine as to Grandson's sexual innocence, prompting an objection and motion to strike the response. The trial court granted the motion and admonished the jury to disregard that evidence.

23. Because we conclude that the evidence was properly excluded under rule 412, we need not address the trial court's alternative basis of exclusion under rule 403.

at 984). Physically impossible testimony occurs "when what the witness claims happened could not have possibly occurred." *Id.* ¶ 17. "[T]estimony is apparently false if its falsity is 'apparent, without any resort to inferences or deductions.'" *Id.* (quoting *Workman*, 852 P.2d at 984). Likewise, testimony is apparently false if it is "incredibly dubious" or "where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion, and there is a complete lack of circumstantial evidence of guilt." *Id.* ¶ 18 (internal quotation marks omitted).

¶ 78 However, disregarding witness testimony as inherently false should be an uncommon course of action, undertaken "only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* ¶ 18. Although the supreme court in *State v. Robbins*, 2009 UT 23, 210 P.3d 288, determined that the standard was met in that case, the court indicated that it was particularly troubled by the fact that the "many inconsistencies" in the victim's testimony were accompanied by several "patently false statements." *See id.* ¶ 22. The court suggested that in the absence of the false statements, the victim's "denial of any abuse to two investigators, her inconsistent accounts regarding the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse may alone [have been] insufficient to invoke the inherent improbability exception." *Id.* The supreme court's analysis in *Robbins* is consistent with its prior statement that "it is not unusual that a child's testimony be somewhat inconsistent, especially in sexual abuse cases," *State v. Virgin*, 2006 UT 29, ¶¶ 37–38, 137 P.3d 787 (affirming magistrate's decision not to bind a defendant over for trial). The likelihood of such inconsistencies is magnified when the child is also mentally challenged. Thus, the consideration of whether Grandson's testimony is inherently improbable must be undertaken with those limitations in mind, lest we adopt a standard that leaves the most vulnerable victims of sexual abuse without recourse.

¶ 79 While Grandson's testimony at his CJC interview, at the preliminary hearing, and at the trial differed as to some particulars, he was consistent in testifying that Marks "sucked on [his] penis." Furthermore, Grandson's inconsistent statements were not "patently false" or "incredibly dubious." Many of them can be read as providing different details about the same incident or as variations resulting from the precise questions employed by the examiner. For example, one of the major inconsistencies highlighted by Marks was the fact that Grandson testified at the preliminary hearing that he had an erection and at trial that he ejaculated, although he never mentioned this in the CJC interview. But, Grandson was never asked directly about these things in the CJC interview. The detective asked Grandson, "Did anything happen to you while [Marks] was [sucking on your penis]?" Grandson answered, "No." Although the detective testified at trial that his question was intended to determine whether anything "had happened to [Grandson] physically," he did not specifically ask about erection or ejaculation. The possibility that it was the nature of questions that influenced the details of Grandson's testimony is bolstered by the special education teacher's statement that she sometimes had to rephrase a question in order for Grandson to understand what was being asked, even when he knew the answer.

¶ 80 The main thrust of Marks's argument is that we should substitute our judgment for that of the jury on the issue of Grandson's credibility. But "[i]t is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses. So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." *State v. Boyd*, 2001 UT 30, ¶ 16, 25 P.3d 985 (emphasis and internal quotation marks omitted). Here, the defense ably called the jury's attention to the inconsistencies in Grandson's reports of the abuse, his confusion over his age at the time it occurred, and the unique issues raised by his mental disabilities. Notwithstanding that effort, the jury found that

Grandson was believable on the critical issue of whether Marks had orally sodomized him—a point on which Grandson was consistent. It was the jury's prerogative to make that credibility determination. *See id.*

¶ 81 Similarly, the evidence was sufficient for the jury to find beyond a reasonable doubt that Grandson was under fourteen at the time of the abuse. In his CJC interview, Grandson admitted that he was "not really sure when" the incident occurred. He then stated that it happened "during the summer" of 2005 when he "was 13" [24] but also reported that it happened "in February." During that same interview, Grandson reported that it happened "this summer," and that he was "still thirteen a little bit" at the time. However, Marks calls our attention to the fact that the CJC interview was taped on August 29, 2006. If the abuse had occurred that same summer, Grandson would have been fourteen years old at the time. Otherwise, Grandson was consistent during the CJC interview that the abuse took place when he was thirteen years old.

¶ 82 At the preliminary hearing, Grandson testified that he was "probably about thirteen" when the abuse occurred and that "it was really hot outside, and people had their swimming pools out." He remembered that it happened the summer he had just finished the seventh grade, which was the summer before the one that had just passed. The prosecutor concluded, and Grandson agreed, that it was "summertime of 2005" when Grandson was "thirteen years old." Grandson remembered that he told his Grandmother about it "[j]ust in 2006, [the] next year." On cross-examination, Grandson again indicated that it happened "in the summer of '05 . . . [w]hen [Grandson was] thirteen," and "not the summer of '06 . . . [w]hich would be last summer."

¶ 83 At trial, Grandson testified that it happened when he was "in the eighth or seventh grade," when he was "about 15," and that he was "[a]t least 15 or 14" when it happened. Grandson further recalled that "last summer" he was fifteen and the abuse had occurred the summer before last summer. Grandson indicated that he waited a year to report the abuse because Marks had threatened him.

¶ 84 We agree with the defense that Grandson's testimony was inconsistent and confusing on the issue of his age at the time of the abuse. However, Grandson's testimony was reasonably consistent at the CJC interview, which took place closest to the incident with Marks. *See State v. Loughton,* 747 P.2d 426, 429 (Utah 1987) (recognizing that videotaped testimony of an alleged child abuse victim, "made nearer to the time of the incident and removed from the pressure of the courtroom situation, [can] be the most accurate account[ ] of the incident available"). And Grandson's special education teacher testified that Grandson only "had some understanding" of the sequence of seasons and months, which would explain his placement of February in the summertime. Furthermore, Grandson was quite sure that the abuse happened when it was hot, he was out of school, and people had their pools out.

¶ 85 More important, however, is the fact that Grandson was consistent in his testimony at the preliminary hearing, at trial, and in his disclosure to Grandmother, that the abuse occurred a year before he reported it to anyone. Two adult witnesses, Grandmother and Uncle, testified that in August 2006 when Grandson was fourteen, Grandson told them that the abuse occurred "last summer" and "[l]ast year." They could be sure of when he made his disclosure because it coincided with a family vacation and wedding. Therefore, we agree with the trial court that the evidence was sufficient to allow the jury to consider whether it was convinced beyond a reasonable doubt that Grandson was under fourteen at the time of the abuse. *See State v. Robbins,* 709 P.2d 771, 773 (Utah 1985) (rejecting claims that the child complainant's confusion regarding the date of the sexual abuse rendered the testimony inherently improbable and explaining that children can more readily identify a "temporal reference point[ ]" than a specific year or age); *State v. Hamblin,* 2010 UT App 239, ¶ 3 n. 3, 239 P.3d 300 (noting that although the child complainant had "initially insisted that she was

---

24. Grandson was born in March 1992.

nine years old when the sexual abuse commenced and ten years old when it ended," other evidence caused the child to "eventually realize[ ] that she must have been older than age nine when the assaults occurred").

## CONCLUSION

¶ 86 The trial court properly excluded the evidence of other sexual conduct pursuant to rule 412 of the Utah Rules of Evidence. Grandson's testimony was not so inherently improbable as to be insufficient to support the guilty verdict.

¶ 87 Affirmed.

¶ 88 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and STEPHEN L. ROTH, Judge.